IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| CITY OF JOLIET, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

The United States of America alleges:

1. This action is brought by the United States against the City of Joliet ("Joliet" or "the City") to enforce the provisions of Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601, *et seq.* (the "Fair Housing Act"), and the Housing and Community Development Act, 42 U.S.C. §§ 5301 *et seq.*, to redress the actions of the City with respect to the federally subsidized apartment complex known as Evergreen Terrace. Evergreen Terrace is a 356-unit apartment complex that currently houses approximately 764 residents, 95.6% of whom are African-American. Through its actions, including an unjustified attempt to take the property through eminent domain, the City seeks to terminate and/or substantially alter and diminish the obligation to provide such affordable housing at the property. Evergreen Terrace represents a significant portion of the housing affordable to persons with low incomes available in the City, and the City has no meaningful plan to provide such affordable housing on a similar scale elsewhere in the City. If successful,

the City's actions will force hundreds of African-American families out of their housing, leaving many with nowhere in the City to live. The City's actions have the purpose and effect of discriminating in housing on the basis of race in violation of the Fair Housing Act and the Housing and Community Development Act.

## JURISDICTION AND VENUE

2. This court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 42 U.S.C. §§ 3614(a), (b), and 5309(c).

3. Venue is proper under 28 U.S.C. § 1391(b) because the Defendant is the City of Joliet, located in the Northern District of Illinois, Eastern Division, a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois, Eastern Division, and the property which is the subject of this lawsuit is located in the Northern District of Illinois, Eastern Division.

## DEFENDANT

4. The City of Joliet is an Illinois municipal corporation, located approximately 40 miles southwest of Chicago in Will County, Illinois. The City's government offices are located at 150 West Jefferson Street in Joliet.

5. Joliet is a home rule city. Joliet exercises zoning and land use authority over land within its boundaries through its Mayor, City Council, and City boards and departments.

6. The Defendant is a unit of local government within the meaning of 42 U.S.C. § 5309(b).

7. From 2002 to the present, the City has been the recipient of Community Development Block Grant funds from HUD, pursuant to the Housing and Community Development Act, 42 U.S.C. §§ 5301 *et seq*. Those federal funds were issued to fund programs of the City's Department of Community and Economic Development. For example, in 2009 and 2010, the City received

funding pursuant to the HCDA totaling approximately $928,723 and $1,005,986, respectively. As part of the receipt of those federal funds, the City has an obligation to affirmatively further fair housing. *See* 24 C.F.R. § 570.601.

8. The Defendant's Department of Community and Economic Development includes three divisions: Building/Inspectional Services, Neighborhood Services, and Planning and Economic Development. The Building/Inspectional Services Division is responsible for administering the City's building codes, including issuing building, demolition and moving permits, and inspecting property for code compliance. The Neighborhood Services Division is responsible for maintaining and expanding affordable housing opportunities within the community. The Planning and Economic Development Division is responsible for administering the Defendant's planning and economic development activities.

## SUBJECT PROPERTY

9. Evergreen Terrace is an eight-building apartment complex in Joliet with 356 housing units. The five buildings located at 350, 358, 362, 363, and 366 North Broadway Street are commonly known as "Evergreen Terrace I." Three buildings located on an adjacent property at 300–301, 311, and 316 North Bluff Street are commonly known as "Evergreen Terrace II." Together, the development is known as "Evergreen Terrace."

10. New West Limited Partnership, an Illinois Limited Partnership, is the beneficiary of the Mid-City National Bank of Chicago Trust No. 1252 land trust, which owns Evergreen Terrace I. As the beneficiary of that land trust, New West has authority over the ownership and operation of Evergreen Terrace I.

11. New Bluff Limited Partnership, an Illinois Limited Partnership, is the beneficiary of the Mid-City National Bank of Chicago Trust No. 1335 land trust, which owns Evergreen Terrace II.

As the beneficiary of that land trust, New West has authority over the ownership and operation of Evergreen Terrace II.

12. New West and New Bluff ("the Owners") contract with Burham Management Company to manage Evergreen Terrace I and II.

13. Evergreen Terrace is a dwelling within the meaning of 42 U.S.C. § 3602(b).

## RELEVANT HOUSING STATUTES

14. In 1974, Congress created the Section 8 program "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing . . . ." 42 U.S.C. § 1437f(a). Low-income individuals who qualify and are selected to participate in the Section 8 program pay 30% of their adjusted incomes as rent and the United States Department of Housing and Urban Development ("HUD") provides a subsidy to pay the remaining rent. 42 U.S.C. §§ 1437f(o)(2)(A), (C), 1437a(a)(1).

15. Section 8 programs are project-based or tenant-based. 42 U.S.C. §§ 1437f(f)(6)–(7). Under the project-based Section 8 program, the owner of a multifamily rental property can enter into a Housing Assistance Payment ("HAP") contract with the local housing authority or HUD to expire after a contract-specific time period. 42 U.S.C. § 1437f(o)(13). Such a contract is termed "project-based" because the subsidy remains with the building when the tenant moves. 42 U.S.C. §§ 1437f(f)(6), (o)(13). Under the tenant-based Section 8 program, also known as the Housing Choice Voucher program, the low-income individual receives a voucher for the Section 8 subsidy that can be taken to a landlord who agrees to participate in the program and complies with the requirements. 42 U.S.C. §§ 1437f(f)(7), (o). While some jurisdictions require landlords to accept vouchers as they would any other income source, in Illinois and in

Joliet, landlords are not required to accept Section 8 voucher holders as tenants. 775 ILL. COMP. STAT. 5/1-103 (2010); JOLIET CODE OF ORDINANCES § 9 1/2-26 (2010).

16. In 1997, in recognition that many of the Section 8 HAP contracts were close to their expiration dates and in response to the rapidly increasing cost to the federal government of providing affordable rental housing and assistance, Congress passed the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA"), Pub. L. No. 105-65, Title V, 111 Stat. 1343, 1384 (codified as amended at 42 U.S.C. § 1437f note). MAHRA established the Mark-to-Market Program ("M2M Program"), in which subsidized Section 8 rents for multifamily housing are reduced to comparable market rents, and HUD-insured and HUD-held financing is correspondingly restructured so that the mortgagor's monthly payments can be paid from the reduced rental income. MAHRA, § 511. In addition, MAHRA is intended to facilitate any needed rehabilitation of the subject housing and to ensure competent management of the properties. *See* MAHRA Interim Rule, 63 Fed. Reg. 48,926 (Sept. 11, 1998).

17. Under MAHRA, HUD oversees the M2M program through a decentralized structure of Participating Administrative Entities ("PAEs"). MAHRA, § 513(a). The PAE is selected by HUD on the basis of statutory criteria. MAHRA, § 513(b). The PAE negotiates with the property owner to develop a Mortgage Restructuring and Rental Sufficiency Plan in accordance with "such terms and conditions as [HUD] shall require." *Id.* § 514(a)(2). See also §§ 512(10), 513(b). The Restructuring Plan mandates use restrictions on the owner or purchaser of the property "to maintain affordability and use restrictions . . . for a term of not less than 30 years." *Id.* § 514(e)(6).

18. As part of its assessment of the property, the PAE develops a Rental Assistance Assessment Plan ("RAAP"), which assesses the impact of converting the subject property to tenant-based

5

assistance based on, among other things, the ability of tenants to find adequate, available, decent, comparable, and affordable housing in the local market. *Id.* § 515(c); 24 C.F.R. § 401.421.

19. In connection with the Restructuring Plan and the RAAP, MAHRA requires the PAE and/or HUD to consult with the "tenants of the project, residents of the neighborhood, the local government, and other affected parties." MAHRA, § 514(f)(2).

## FACTUAL ALLEGATIONS

20. In or around 1968, River West Apartments, an affordable housing complex, was built on the current site of Evergreen Terrace. The complex was later split into River West Apartments and Bluff Plaza Apartments.

21. In or around 1978, Joliet proposed that the buildings at River West be purchased and redeveloped to contain a mix of moderately subsidized and market rent rental units and that there be "an immediate change in ownership and tenant class" at the complex. In a meeting between Joliet officials and HUD representatives on January 24, 1978, HUD representatives expressed concern that Joliet's redevelopment plan did not establish that a sufficient number of replacement affordable housing units would be provided elsewhere in the City. HUD never approved the redevelopment plan and it was never implemented.

22. In 1982, the owners of River West entered into a 20-year HAP Contract with HUD to rehabilitate River West, which was renamed Evergreen Terrace I. In 1983, the owners of Bluff Plaza entered into a 20-year HAP contract with the City. Pursuant to that contract, Bluff Plaza was partially demolished and the remaining buildings rehabilitated and renamed Evergreen Terrace II.

23. Since at least 1983, pursuant to the regulatory agreements, use restriction agreements, and HAP contracts between the owners and HUD, Evergreen Terrace has operated as a project-based Section 8 assistance program. Accordingly, all tenants at Evergreen Terrace must meet the HUD definitions for low income, very low income, or extremely low income families. 24 C.F.R. § 5.603, 5.653.

24. Since at least 1978, City officials have expressed opposition and hostility to Evergreen Terrace. For example, according to a November 11, 1999, newspaper article, Joliet Councilman Tim Brophy characterized Evergreen Terrace as a "cancer on the civic body of Joliet" and proposed that Joliet "follow Chicago's lead and tear down" Evergreen Terrace.

25. In 2001, as its HAP Contract was nearing its 2002 expiration date, New West sought financial restructuring for Evergreen Terrace I under HUD's M2M program. Similarly, in 2003, as its HAP Contract was nearing its 2003 expiration date, New Bluff sought financial restructuring for Evergreen Terrace II under HUD's M2M program.

26. In 2002, HUD appointed the Illinois Housing Development Authority ("IHDA") to serve as Evergreen Terrace's PAE. As the appointed PAE, IHDA was charged with doing an assessment both of the physical condition of the property and the availability of housing for those who would be displaced. At the conclusion of those assessments, IHDA was to make recommendations regarding its findings about whether the property should be refinanced.

27. To satisfy its responsibility of assessing Evergreen Terrace's physical condition, IHDA contracted with an independent appraiser, Great Realty Advisors, and an architectural firm, Carl R. Klimek & Associates. Great Realty Advisors concluded that the units were of sound construction with adequate insulation and soundproofing, the floor plans were functional in design and layout, and the housing was "adequately maintained and in average condition."

Klimek & Associates concluded that, while some repair was needed, there was no evidence that any "critical repairs" were necessary.

28. Consistent with MAHRA procedures, *see supra* para. 15, HUD considered the views of the City about the applications of New West and New Bluff for financial restructuring of Evergreen Terrace under the M2M program. Joliet consistently opposed such restructuring. Specifically, on January 15, 2002, Joliet Mayor Arthur Schultz sent a letter to Ed Hinsberger, Director of the HUD Chicago Multifamily Hub, requesting that HUD "not renew the federally subsidized program at Evergreen Terrace," which he characterized as a "blight to Joliet's near west side," and advocating for the "relocation of tenants" and the "elimination of the Evergreen Terrace facility." Similarly, during the M2M process and in conversations with HUD officials, Joliet Councilman Brophy referred to Evergreen Terrace residents as "rats" and "rats from Robert Taylor Homes" and indicated that Joliet should follow Mayor Daley's lead and get rid of the "rats" by removing Evergreen Terrace. Further, according to city council meeting minutes from May 19, 2003, the Deputy City Manager, who was unnamed, stated that Evergreen Terrace "has been a tremendous burden to the community for 40 years."

29. In March 2003, IHDA conducted a RAAP of Evergreen Terrace that concluded there was a strong need for affordable housing and that displaced families from Evergreen Terrace would not be able to find housing in or near the City of Joliet. IHDA's RAAP report assessed the availability of comparable alternative housing for Evergreen Terrace residents, particularly the availability and accessibility of tenant-based Section 8 units. IHDA found that the rental market had not maintained pace with growth in population and employment in Joliet and that the need for affordable housing was strong. It further found that public housing had a 100% occupancy rate and, more generally, affordable housing had an overall occupancy rate of more

than 98%. Based on the insufficient number of units available to Section 8 voucher holders, IHDA ultimately concluded that relying on vouchers would not ensure that the majority of Evergreen Terrace residents could be relocated in or near the City of Joliet.

30. In May of 2003, HUD approved a Restructuring Plan for Evergreen Terrace and signed a restructuring commitment to close the transaction within 60 days.

31. On July 16, 2003, there was a meeting between representatives of the City, HUD, and IHDA about Evergreen Terrace. At that meeting, Joliet asserted that Evergreen Terrace was in poor condition and requested that HUD delay the restructuring to consider Joliet's alternate plan for Evergreen Terrace. HUD officials agreed and Joliet submitted a relocation plan entitled "Program of Choice," proposing a mix of Section 8 vouchers, public housing at other locations and homeownership programs. On October 30, 2003, the Office of Multifamily Housing Assistance Restructuring at HUD rejected the City's relocation plan as deficient. On November 14, 2003, Joliet submitted a revised relocation plan, which again relied on Section 8 vouchers as the primary means of relocating residents.

32. On November 12, 2003, IHDA issued a supplemental report to HUD. The report found a lack of affordable housing (significantly less than 5% vacancy rate) and resistance from landlords to accept Section 8 vouchers. IHDA reported that, in March 2003, the Housing Authority of Joliet ("HAJ") sent out over 1,000 letters to Joliet landlords seeking Section 8 rentals for 88 families. After five months, HAJ was only able to place half of those families. IDHA also concluded that "[t]he City's very vocal assertions about Evergreen Terrace being crime ridden, while long, loud, frequent and frequently reported in the local press, are not supported by the facts."

33. In 2004, HUD replaced IHDA as Evergreen Terrace's PAE and designated Heskin Signet Partners, a consulting agency that provides underwriting, valuation, mortgage restructuring and closing services for the M2M program, to do another full assessment of Evergreen Terrace.

34. To satisfy its responsibility of assessing Evergreen Terrace's physical condition, Heskin Signet contracted with Gill Group Appraisers and JPS & Associates architectural firm to inspect Evergreen Terrace. Based on reports from Gill Group and JPS, Heskin Signet set forth a plan for rehabilitating the property within a year of closing under the M2M program at an estimated cost of $957,392.

35. In July 2005, Heskin Signet conducted its RAAP analysis to assess the availability of comparable alternative housing for Evergreen Terrace residents, particularly the availability and accessibility of Section 8 Housing Choice Vouchers. The study identified 790 vacant housing units within a 15-mile radius. Of those, Heskin Signet found only five landlords with a total of 39 vacant units who would agree to accept Section 8 voucher holders as tenants.

36. In the summer of 2005, acting in accordance with MAHRA, the HUD Secretary approved the refinancing to a preserve the affordable housing at Evergreen Terrace. HUD's determination followed a three-year process carried out in accordance with MAHRA in which HUD considered the input from its contractors, the Illinois Housing Development Authority and Heskin Signet Partners, and input from interested parties, including the City.

37. On August 17, 2005, just one month after the refinancing was approved, Joliet passed Resolution No. 5655, declaring Evergreen Terrace a public nuisance and a blighted area. To support the Resolution, the City relied in part on code enforcement violations issued by the City's Department of Community and Economic Development.

38. On September 19, 2005, HUD and the owners of Evergreen Terrace entered into a commitment to restructure the financing under MAHRA.

39. On October 4, 2005, the City passed Ordinance 15298, authorizing corporation counsel to initiate court proceedings to take Evergreen Terrace through eminent domain so that it could be "redeveloped." The Ordinance ignored the fact that funds had been authorized to make improvements at Evergreen Terrace and described the apartment complex as blighted. It further stated that the City's redevelopment of Evergreen Terrace would include an unspecified amount of affordable housing, unspecified "compatible residential land uses," a public park, and a recreational facility. The City's Department of Community and Economic Development would be involved in the redevelopment plans for Evergreen Terrace and the relocation of its current residents.

40. On or about October 7, 2005, Joliet brought suit to condemn Evergreen Terrace in the Circuit Court of Will County, Illinois. Because the action affects property on which the United States may have an interest, the condemnation action was removed to federal court on November 29, 2005.

41. In early 2006, pursuant to a congressional request, HUD's Office of the Inspector General audited the proposed restructuring of Evergreen Terrace I. In his February 9, 2006, report, Ronald J. Hosking, Regional Inspector General for Audit, concluded that HUD had accurately assessed the physical condition of Evergreen Terrace I and had appropriately evaluated the restructuring project. The report further noted that displaced tenants would have "serious difficulty" finding comparable housing within a reasonable distance.

42. On September 27, 2006, HUD and New West executed final HAP Full Mark-to-Market Renewal Contracts for Evergreen Terrace. Those agreements were amended on November 3,

2006, and on November 6, 2006, HUD and New West closed on the agreements. As part of those agreements, HUD made new direct mortgage loans to New West and New Bluff in the principal amounts of $8,546,100.09 and $3,019,649.08, respectively. On that same date, pursuant to Section 514(c)(6) of MAHRA, the Owners signed regulatory agreements and 30-year use agreements requiring Evergreen Terrace to be used for affordable housing for 30 years. Finally, the Owners entered into agreements with HUD and others that required the Owners to enter into escrow deposit agreements for repairs, rehabilitation and improvements to Evergreen Terrace at the estimated cost of nearly $4 million.

43. According to city council meeting minutes from October 6, 2009, Joliet Councilman Brophy stated that the "unarmed security at Evergreen Terrace is like having a little yellow duck watch a pack of wolves." He further noted that "he would hope that we revitalize our efforts and our thoughts about this tumor that is a cancer on the City of Joliet."

44. Since completing the restructuring process under the M2M Program, substantial improvements have been made to Evergreen Terrace to date, including (1) immediate repairs and capital improvements to the interior and exterior; (2) installation of a new and comprehensive security plan and new security posts; (3) new exterior landscaping and lighting; and (4) renovation of kitchens and bathrooms.

45. Nevertheless, the City continues to try to condemn Evergreen Terrace while neglecting to propose any realistic plan to provide sufficient adequate and affordable housing to those who would be displaced from Evergreen Terrace and knowing that there will be few, if any, opportunities for displaced families to remain in or near Joliet.

46. On October 5, 2009, Teresa Davis, a tenant at Evergreen Terrace, filed a housing discrimination complaint with HUD, alleging that the City's action to take Evergreen Terrace

by eminent domain constitutes discrimination on the basis of race. Pursuant to 42 U.S.C. § 3610(g)(2)(C), HUD referred the complaint to the Department of Justice on October 8, 2009.

47. According to 2010 United States Census, Joliet had a total population of 147,433 residents. Of those residents who identified themselves as only one race in the 2010 Census, approximately 68% of Joliet residents identified as White and 16% of Joliet residents identified as Black or African-American.

48. Evergreen Terrace I is comprised of 241 units and, as of July 2011, housed approximately 535 residents in 235 households. 525 (98%) of the residents are African-American. Evergreen Terrace II is comprised of 115 units, and as of July 2011, housed 229 residents in 110 households. 206 (90%) of the residents are African-American. Thus, 731 of the 764 residents (95.6%) at Evergreen Terrace are African-American.

49. Evergreen Terrace is located in Census Tract 8819, Block Group 3.

50. According to the 2010 Census, Census Tract 8819, which encompasses Evergreen Terrace, is comprised of approximately 44% Black or African-American residents and 36% White residents.

51. According to the 2010 Census, approximately 91% of the residents in Block Group 3 are Black or African-American, as compared to 16% in the City as a whole. About 5% of this Block Group's residents are white, compared to the 68% in the City as a whole.

52. Evergreen Terrace is located in one of two majority African-American census tracts west of the Des Plaines River. In comparison, four of the census tracts on the east side of the river are majority African-American.

53. According to HAJ, over 1900 households in Will County, more than 87% of whom are African-American, currently hold Section 8 Housing Choice vouchers. More than 1900

households, more than 87% of whom are African-American, are on the wait-list for Section 8 Housing Choice vouchers.

54. The City's actions described herein were taken because of the race or color and of the current and prospective tenants of Evergreen Terrace. The purpose and effect of the City's actions and proposed actions are to limit or reduce the number of Black or African-American residents residing within the City of Joliet. Such actions, if carried out, would have a disproportionate adverse impact on African-Americans and operate to perpetuate segregation in Joliet.

## COUNT I – Violation of the Fair Housing Act

55. The allegations of paragraphs 1–52, above, are incorporated herein by reference.

56. If the course of Defendant's conduct, set forth above, in paragraphs 1–52 is carried out, it will: (1) make dwellings unavailable or deny dwellings to persons because of race or color, in violation of 42 U.S.C. § 3604(a); and (2) interfere with persons in the exercise or enjoyment of any right granted or protected by 42 U.S.C. § 3604, in violation of 42 U.S.C. § 3617.

57. Based on the foregoing conduct, Defendant has engaged in:

   a. A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act under 42 U.S.C. § 3614(a);

   b. A denial to a group of persons of rights granted by the Fair Housing Act that raises an issue of general public importance under 42 U.S.C. § 3614(a); or

   c. A discriminatory housing practice under 42 U.S.C. § 3614(b)(1).

58. Defendant's conduct described above was intentional, willful, and taken in disregard for the rights of others.

59. The Defendant's proposed actions with respect to Evergreen Terrace, if carried out, will cause injury to the current owners and operators of Evergreen Terrace, to current and prospective

residents of Evergreen Terrace, and to other persons seeking affordable housing in and around the City of Joliet. These persons are aggrieved persons within the meaning of 42 U.S.C. § 3602(i) and 42 U.S.C. § 3614(d)(1)(B).

## COUNT II – Violation of the Housing and Community Development Act

60. The allegations of paragraph 1–52, above, are incorporated herein by reference.

61. If the course of Defendant's conduct set forth above in paragraphs 1–50 is carried out, a group of persons will be excluded from participation in, denied the benefits of, or subjected to discrimination on the ground of race or color by a program or activity funded in whole or in part with funds made available by the United States Department of Housing and Urban Development, in violation of 42 U.S.C. § 5309(a).

62. Based on the foregoing conduct, the Defendant has engaged in a pattern or practice of discrimination in violation of 42 U.S.C. § 5309(c).

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court enter an ORDER that:

A. Declares that the Defendant's conduct, as alleged herein, violates the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq*., and the Housing and Community Development Act, 42 U.S.C. § 5301 *et seq*.;

B. Enjoins the Defendant, its officers, agents, employees, successors and all other persons in active concert or participation with Defendant, from:

   1. Discriminating on the basis of race or color against any person, through condemnation or otherwise, in the decisions regarding land use and zoning, in violation of 42 U.S.C. 3601 *et seq*.;

2. Proceeding with the condemnation action against Evergreen Terrace unless it develops and implements a plan providing for sufficient adequate and affordable housing for those persons who would be displaced from Evergreen Terrace;

3. Interfering with or threatening to take any action against any person in the exercise or enjoyment of rights granted or protected by the Fair Housing Act, as amended; and

4. Discriminating in any program or activity funded in whole or in part by funds made available under the Housing and Community Development Act, in violation of 42 U.S.C. § 5309(a).

5. Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of the City's unlawful practices.

C. Requires such actions by the Defendant as may be necessary to restore, as nearly as practicable, the persons harmed by Defendant's past unlawful practices to the position they would have been in but for the discriminatory conduct;

D. Awards appropriate monetary damages to fully compensate each person aggrieved by Defendant's discriminatory housing practices for injuries caused by the Defendant's discriminatory conduct, pursuant to 42 U.S.C. §§ 3614(d)(1)(B);

E. Assesses a civil penalty against Defendant to vindicate the public interest, pursuant to 42 U.S.C. § 3614(d)(1)(c); and

F. Awards such additional relief that may be required to remedy the violations of federal law detailed herein and/or to prevent future violations of such laws by the Defendant.

## DEMAND FOR JURY TRIAL

Plaintiff, United States of America, demands a trial by jury on all issues so triable in this matter.

The United States further prays for such additional relief as the interests of justice may require.

Respectfully submitted this 4th day of August, 2011,

| | |
|---|---|
| | ERIC H. HOLDER JR.<br>Attorney General<br><br>THOMAS E. PEREZ<br>Assistant Attorney General<br>Civil Rights Division |
| PATRICK J. FITZGERALD<br>United States Attorney | |
| s/ Patrick Johnson<br>PATRICK JOHNSON<br>Assistant United States Attorney<br>219 S. Dearborn St., 5th Floor<br>Chicago, IL 60604<br>Tel: (312) 353-5327<br>Fax: (312) 353-2067<br>patrick.johnson2@usdoj.gov | STEVEN H. ROSENBAUM<br>Chief, Housing and Civil<br>Enforcement Section<br>Civil Rights Division<br><br>TIMOTHY J. MORAN<br>Deputy Chief<br>BETH FRANK<br>ANDREA STEINACKER<br>Trial Attorneys<br>Housing and Civil Enforcement Section<br>Civil Rights Division<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Northwestern Building, 7th Floor<br>Washington, D.C. 20530<br>Tel: (202) 514-4713, Fax: (202) 514-1116<br>Beth.Frank@usdoj.gov<br>Andrea.Steinacker@usdoj.gov |