IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NEW WEST, et al. | ) | |
| | ) | 05 C 1743 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF JOLIET, et al. | ) | Hon. Charles R. Norgle |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| THERESA DAVIS, et al. | ) | |
| | ) | 07 C 7214 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF JOLIET, et al. | ) | Hon. Charles R. Norgle |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 11 C 5305 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF JOLIET, et al. | ) | Hon. Charles R. Norgle |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the court are motions by the City of Joliet ("Joliet") to dismiss complaints by plaintiffs in three separate but related lawsuits which spring from a contested

condemnation action. For the following reasons, Joliet's motions are granted in part and denied in part.

## I. BACKGROUND

The factual background of these cases is well documented in previous opinions by this court and by the Seventh Circuit.[1] The following is a brief summary of this complex and enduring matter arising out of a municipality's attempted exercise of eminent domain. Evergreen Terrance, a 356-unit apartment complex in Joilet, Illinois, houses approximately 750 to 800 residents[2] who rely on Section 8 assistance. The vast majority are African-Americans. If the half-century-old complex is torn down, alternative housing options nearby may be limited. Seven years ago, in spring 2005, an owner of Evergreen Terrace, New West Limited Partnership ("New West"), sued Joliet alleging civil rights violations.[3] New West sued because it was clear Joliet intended to "redevelop" Evergreen Terrace by condemning it and turning it into a park.

Five months after New West sued, Joliet passed a city ordinance declaring the complex a blighted nuisance. Two months after that, in autumn 2005, Joliet filed a

---

[1] See City of Joliet v. New West, 562 F.3d 830 (7th Cir. 2009); New West v. City of Joliet, 491 F.3d 717 (7th Cir. 2007); City of Joliet v. Mid-City Nat'l Bank of Chi., No. 05 C 6746, 2008 WL 4344896 (N.D. Ill. Mar. 27, 2008); City of Joliet v. Mid-City Nat'l Bank of Chi., No. 05 C 6746, 2007 WL 2298403 (N.D. Ill. Aug. 3, 2007).

[2] Second Am. Compl., New West v. City of Joliet, 05 C 1743 (filed Mar. 24, 2005) (stating that between Evergreen Terrace I and II, the complex had 786 residents as of October 2011); see also Mary Owen, Business, Public Officials Pen Letter Supporting Evergreen Terrace Teardown, triblocal.com/Joliet/2011/12/05/business-public-officials-pen-letter-supporting-evergreen-terrace-teardown (Jan. 28, 2012 12:10 CT) (750 tenants).

[3] Along with the city, Joliet's mayor, former mayor, city manager, former city manager, and deputy city manager are also sued officially and individually. This opinion refers to them collectively as "Joliet." New West and New Bluff, both Illinois limited partnerships, each own a phase of the two-phase complex. Both are plaintiffs here. This opinion refers to them collectively as "New West." The United States Department of Housing and Urban Development is the condemnation defendant and the United States is the civil rights plaintiff. This opinion refers to them collectively as "the government" or the "United States."

condemnation complaint against Evergreen Terrace in state court. The United States Department of Housing and Urban Development ("HUD"), which has a security interest in the complex, intervened as a defendant once the condemnation case was removed to federal court. In September 2006, this court dismissed New West's original complaint. But the Seventh Circuit in July 2007 reversed and remanded, directing this court to take up the condemnation action first and therein resolve issues present in both cases. In December 2007, tenants of Evergreen Terrace filed their own civil rights lawsuit against Joliet. In March 2008, this court denied summary judgment for the defendants in the condemnation case, and in April 2009 the Seventh Circuit affirmed.

In August 2011, more than six years after New West's opening salvo, the United States filed its own civil rights suit against Joliet. The government is now the third party to become both a defendant in the condemnation case and an individual plaintiff in a separate Fair Housing Act ("FHA") lawsuit.[4] All four cases are assigned to this court as related under Local Rule 40.4. The four cases are also consolidated for discovery under Rule 42. In the three cases where Joliet is a defendant, Joliet moves the court to dismiss the complaints by plaintiffs New West, Evergreen Terrace tenants Angela Davis, et al. (the "Tenants"), and the United States. The motions became fully briefed on December 19, 2011. Because the legal and factual issues overlap in each of Joliet's three motions to dismiss, the opinion is consolidated.

---

[4] Two of the lawsuits, by the Tenants and by the government, were filed after the condemnation case. One, by New West, predated the formal initiation of condemnation proceedings. All three make basically the same factual claims of discrimination.

## II. DISCUSSION

### A. Standard of Decision

To survive a Rule 12(b)(6) motion, a complaint must contain facts sufficient to state a claim for relief that is plausible on its face. See Indep. Trust Corp. v. Stewart Info. Servs. Corp., No. 11–2108, 2012 WL 32066, at *3 (7th Cir. Jan. 6, 2012) (citing Ashcroft v. Iqbal, 129 U.S. 1937, 1949 (2009)). The court accepts well-pleaded facts in the complaint as true and draws reasonable inferences in plaintiffs' favor. See Iqbal, 129 U.S. at 1949; McCauley v. City of Chi., No. 09-3561, 2011 WL 4975644, at *14 (7th Cir. Oct. 20, 2011). A complaint must provide the grounds of the claimant's entitlement to relief, contain more than recitations of the elements of a cause of action, and allege enough to raise a right to relief above the speculative level. See McCauley, 2011 WL 4975644, at *4 (citing Bell Atl. v. Twombly, 550 U.S. 554, 555 (2007)).

In a Rule 12(b)(1) motion, the burden to establish standing is on the party invoking federal jurisdiction, here the plaintiffs. Scanlan v. Eisenberg, No. 11-1657, 2012 WL 169765, at *3 (7th Cir. Jan. 20, 2012) (citing Lee v. City of Chi., 330 F.3d 456, 468 (7th Cir. 2003)). The plaintiffs must show three elements: causation, redressability, and—at issue here—"an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical." Id. (quoting Lee, 330 F.3d at 468). To satisfy this element, the plaintiffs must show they have sustained or are "immediately in danger of sustaining some direct injury." Id. (quoting Wis. Right to Life v. Schober, 366 F.3d 485, 489 (7th Cir. 2004)). "Mere speculation" does not establish the injury element. Id.

In its motions, Joliet argues for dismissal on grounds of failure to state a claim upon which relief can be granted, the lack of a case or controversy, and duplicative litigation. These arguments are advanced against each plaintiff. Joliet advances a separate argument against New West to dismiss an implied preemption count. The court addresses the common issues first.

### B. Issues Common to the Tenants, New West, and the United States

#### 1. Case or Controversy

Joliet contends that Article III bars claims by the plaintiffs because their complaints attack the events leading up to the unconsummated condemnation process. "Such harm," Joliet argues, "will exist only *if* Joliet prevails in the eminent domain case, and not before." Mem. in Supp. of Mot. to Dismiss Second Am. Compl. or, in the Alternative, to Stay the Action 11 [hereinafter Mot. to Dismiss New West]. Joliet believes the resolution of the condemnation case will control everything else in the related litigation. Joliet contends that the plaintiffs cannot maintain any lawsuits because either Joliet will win the condemnation action, defeating all of the plaintiffs' claims, or Joliet will lose, avoiding injury to the plaintiffs in the first place. Of course, the Seventh Circuit has implicitly rejected this argument. See New West, 491 F.3d at 721 (finding New West has standing on bases of alleged financial losses and alleged discrimination). The Tenants and government now allege similar injuries.

Apparently to avoid the thrust of the 2007 panel's decision, Joliet clothes its discredited Article III injury arguments in ripeness terms. The doctrines of Article III injury and ripeness are similar but distinct. See Blake-Bey v. Cook Cnty., No. 10 C 5246, 2011 WL 760074, at *2-3 (N.D. Ill. Feb. 24, 2011) (citing Smith v. Wisc. Dep't of

Agric., Trade & Consumer Prot., 23 F.3d 1134, 1141 (7th Cir. 1994) (noting the two doctrines may overlap conceptually, but are distinct)). Article III standing is a constitutional threshold matter, while ripeness is a prudential concern ordinarily arising in pre-enforcement agency disputes. See Wis. Right to Life State Political Action Comm. v. Barland, No. 11-2623, 2011 WL 6225138, at *4-6 (7th Cir. Dec. 12, 2011); see also Jennings v. Auto Meter Prod., Inc., 495 F.3d 466, 477 (7th Cir. 2007) (ripeness doctrine allows courts to avoid abstract entanglements).

Article III injury and prudential ripeness overlap when the certainty of an injury is in doubt—just what Joilet contends here. See Ind. Right to Life, Inc. v. Shepard, 507 F.3d 545, 549 (7th Cir. 2007). An Article III injury must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Barland, 2011 WL 6225138, at *4 (quoting Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)). Similarly, "[r]ipeness concerns may arise when a case involves uncertain or contingent events that may not occur as anticipated, or not occur at all." Id. at *6 (citing Bauer v. Shepard, 620 F.3d 704, 708-09 (7th Cir. 2010) (finding standing in a pre-enforcement case that was nevertheless unripe)). Indeed, ripeness, like other prudential standing doctrines, springs from the Article III requirement of a "case or controversy." See Warth v. Seldin, 422 U.S. 490, 498 (1975); Barland, 2011 WL 6225138, at *6; see also Pilsen Neighbors Cmty. Council v. Burris, 672 F. Supp. 295, 307 (N.D. Ill. 1987) ("The constitutional and prudential standing doctrines restrict judicial power to 'cases' and 'controversies' . . . ."). Because the concepts are

somewhat conflated in Joliet's motions, the court in an abundance of caution construes Joliet to be making both Article III injury and prudential ripeness arguments.[5]

### a. Tenants

The Tenants argue their injury is imminent loss of their homes, which is "concrete and particularized" for Article III purposes. That Joliet has not evicted them does not avoid the injury. Joliet has for years been trying informally to raze the apartments, and for the past six years suing to take Evergreen Terrace through eminent domain. Simply put, Joliet is not giving up. The loss of homes, on these facts, is "certainly impending" and satisfies the imminence requirement. See Mass. v. EPA, 549 U.S. 497, 542 (2007); Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983); Bauer, 620 F.3d at 708; Sierra Club v. Franklin Cnty. Power of Ill., LLC, 546 F.3d 918, 926 (7th Cir. 2008). Moreover, the Tenants allege Joliet has systematically tried to evict them by interfering with Section 8 renewals and refinancing at Evergreen Terrace; that Joliet's motive for this is racial animus, inferred from allegedly racist comments made by Joliet city officials; and that Joliet has rallied support to raze the complex by stigmatizing it as a den of crime. These alleged injuries are concrete and have already occurred, satisfying Article III injury. A ripeness inquiry raises no question about either the "fitness of the issues for judicial decision" that the Tenants' allegations present, or about "the hardship to the parties of withholding court consideration." Barland, 2011 WL 6225138, at *6 (quotations omitted). The court notes that Joliet does not attack any particular claim by the Tenants. The city seems to believe its ripeness

---

[5] Joliet's motions—as plaintiffs argue—border in places on frivolity. For example, Joliet asserts in a heading that "New West's claims should be dismissed *or stayed* for lack of a 'case or controversy.'" Mot. to Dismiss New West 11 (emphasis added). Absent a case or controversy this court lacks jurisdiction and cannot stay the matter because there isn't one. This stripe of legal argument runs sporadically through Joliet's motions.

7

argument sinks the complaint as a whole. The court rejects this argument. The Tenants have standing and their claims are ripe.

### b. New West

New West argues its injuries began with Joliet's efforts to stymie its refinancing and restructuring efforts. It alleges the city's lobbying was undertaken with racial animus and featured numerous false statements, including a report containing intentionally fraudulent information. The mayor himself allegedly made repeated racist remarks ("gangbangers") to New West's representatives, among others. The mayor in February 2005 allegedly also expressly threatened the owners of New West with a condemnation action. The allegedly racially motivated lobbying and threats led to higher debt service and higher vacancy rates. After New West sued Joliet in March 2005, Joliet filed four lawsuits against Evergreen Terrace and its owners between April 2005 and October 2005. The suits concern (1) payment for security services provided by Joliet police; (2) payment of fines for building code violations; and (3) a demolition action.

New West's alleged injuries include financial losses, stigmatization, and sham litigation—which create Article III standing, as discussed earlier. In its ripeness argument, Joliet ignores these allegations and focuses on the pending eminent domain case. Joliet relies on cases involving zoning disputes that turn on administrative exhaustion requirements. See United States v. Vill. of Palatine, 37 F.3d 1230, 1233 (7th Cir. 1994) (rejecting discrimination claims for failure to invoke local governmental procedures that allow for exhaustion). Joliet also cites cases involving regulatory takings, which have a special exhaustion requirement. See Urban Devs., LLC v. City of Jackson,

468 F.3d 281, 292-93 (5th Cir. 2006). The plaintiffs argue these cases are too far afield from a direct condemnation action and are thus inapposite. The court agrees.

Joliet does cite a direct condemnation case, Paraquad, Inc. v. St. Louis Housing Authority, 259 F.3d 956 (8th Cir. 2001) (reviewing summary judgment). In Paraquad, a divided panel found sketchy allegations of future discriminatory effects of razing buildings unripe while expressly distinguishing a case where a city unconstitutionally blocked a plaintiff's financing such that "[t]he [unconstitutional] delay itself was the injury." Id. at 960. Here the closest analog to the unripe claim in Paraquad is a claim of disparate impact, which in any case survives this motion to dismiss, cf. id. at 957 (reviewing summary judgment, not motion to dismiss), while all other claims in these cases allege injuries leading up to the proposed taking itself. Because it concerned uncertain post-taking injury and distinguished concrete pre-taking injury, Paraquad is distinguishable on its facts and its summary judgment posture. Moreover, although Paraquad was overtly decided on ripeness grounds, its ripeness theory directly overlaps Article III injury. Compare id. at 958-59 (finding ripeness to require an injury that is "imminent" or "certainly impending") with Friends of the Earth, 528 U.S. at 180 (finding Article III injury to require a harm that is "actual or imminent"). Because New West adequately alleges Article III injury, Paraquad does not help Joliet.

Joliet attempts to portray title transfer pursuant to condemnation as an exhaustion requirement of sorts, but as a proposed *fait accompli* this argument is unavailing. It is noteworthy that the affirmative defenses which Joliet argues mirror plaintiff's civil rights claims—on which basis Joliet argues for dismissal—must be pled in the condemnation answer or are waived. See Fed. R. Civ. P. 8(c), 71.1. It would be an odd outcome to find

unripe the same legal arguments Joliet agrees were properly advanced years ago. The court also notes that Joliet attacks some of the same claims New West asserted in the original lawsuit and which the Seventh Circuit determined created standing. See New West, 491 F.3d at 720-21. New West still has standing and its claims are ripe.

### c. The United States

Like the Tenants and New West, the government properly alleges that Joliet's past conduct constitutes Article III injuries. As for the eminent domain action, the government argues Joilet is acting with discriminatory intent and for discriminatory effect, a violation of the FHA and the Housing and Community Development Act (HCDA). As the Seventh Circuit has observed: "[A] state or local government is not free to use its powers in order to discriminate against persons of a particular race." City of Joliet, 562 F.3d at 837. Joliet's challenge to these claims is meritless and borderline frivolous. The government has standing and its claims are ripe.

### 2. Duplicative Litigation: Tenants, New West, and the United States

Joliet argues the plaintiffs' civil rights claims mirror their affirmative defenses in the condemnation action and should therefore be dismissed or stayed. Joliet cites Servlin v. Arthur Andersen & Co., 3 F.3d 221 (7th Cir. 1993), for the proposition that "[a]s a general rule, a federal suit may be dismissed for reasons of wise judicial administration . . . whenever it is duplicative of a parallel action already pending in another federal court." Id. at 223 (quotations omitted). The Servlin court found "no significant difference" between two complaints by the same plaintiff. Id. Here there are three civil rights complaints by three plaintiffs and a fourth eminent domain complaint by the defendant in the three civil rights suits. Joliet compares the plaintiffs' claims in three

civil rights suits to their defenses in the eminent domain suit. On this comparison, the court finds "significant difference[s]." Id.

In particular, Joliet's argument raises the obscure and somewhat unsettled question of whether counterclaims—in particular, counterclaims seeking legal relief—are permitted in condemnation actions. See N. Natural Gas Co. v. Approx. 9117.53 Acres, No. 10-1232-WEB, 2011 WL 2118642, at *3 (D. Kan. May 17, 2011) ("There is a clear split of authority on whether Rule 71.1(e) prohibits the assertion of counterclaims in answer to a condemnation complaint."). Joliet does not argue the issue itself, but the import of Joliet's arguments make avoiding it unwise. If counterclaims are prohibited, then the plaintiffs, who seek relief beyond equitably enjoining Joliet's attempted taking, must be allowed to maintain their separate actions.

The weight of authority appears to bar counterclaims. See Fed. R. Civ. P. 71.1(e) (expressly allowing defenses and objections in the answer); United States v. 191.07 Acres of Land, 482 F.3d 1132, 1140 (9th Cir. 2007) ("A property owner cannot file a counterclaim in a direct condemnation action."); United States v. Certain Land Situated in City of Detroit, 361 F.3d 305, 308 (6th Cir. 2004) (permitting no counterclaim in direct taking); United States v. Banisadr Bldg. Joint Venture, 65 F.3d 374, 380 (4th Cir. 1995) (noting proposed counterclaim "which would otherwise seem an appropriate vehicle for raising a claim" in condemnation action must be filed in a separate action); N. Natural Gas Co. v. Approx. 9117.53 Acres, No. 10-1232-WEB-DWB, 2011 WL 4345668, at *1 n.2, 4 (D. Kan. July 13, 2011) (dismissing counterclaims from condemnation action without prejudice to their renewal in a separate action); see also 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3048 (2d ed. 2011) (observing that

under what is now Rule 71.1 a "counterclaim may not be raised in the answer" because the answer's only function "is to contest the right of the government to take the land"); but see Columbia Gas Transmission LLC v. Crawford, 267 F.R.D. 227, 228-29 (N.D. Ohio 2010) (construing Rule 71.1 to permit trespass counterclaim for damages).

Following the weight of authority, the court construes Rule 71.1 to prohibit counterclaims seeking legal relief. Because the plaintiffs all seek money damages and other forms of relief not available to a party fighting an eminent domain action, there was no opportunity to pursue them in Joliet's removed condemnation action. The plaintiffs' suits are therefore not duplicative. Joliet's motion to dismiss on grounds of duplicative litigation is denied. Joliet alternatively moves the court to stay the proceedings, citing the panel's 2007 decision observing that resolution of the condemnation case would likely preclude issues in the civil rights lawsuits. See New West, 491 F.3d at 721. The court addresses Joliet's motions to stay in a separate order.

### 3. Failure to State a Claim

#### a. Tenants, New West, and the United States

As to each plaintiff, Joliet advances the anemic proposition that, as a matter of law, bringing an eminent domain action cannot constitute a violation of law, and thus the plaintiffs' suits should be dismissed. The Seventh Circuit has already disagreed with this position: "A state or local government is not free to use its powers in order to discriminate against persons of a particular race . . . ." City of Joliet, 562 F.3d at 837. Bringing an eminent domain action may violate federal law if it is brought to discriminate. See id. Joliet's argument is meritless and borderline frivolous.

Joliet also argues the Noerr-Pennington Doctrine, which protects litigation, lobbying, and speech, precludes the plaintiffs' claims and requires dismissal at this stage. See Tarpley v. Keistler, 188 F.3d 788, 794 (7th Cir. 1999) (noting the doctrine, which originated in antritrust, has been applied to § 1983 actions); see also Kearney v. Foley & Lardner, LLP, 590 F.3d 638, 645 (9th Cir. 2009) (discussing New West, 491 F.3d at 721-22, in holding that "a governmental entity or official may receive Noerr-Pennington immunity for the petitioning involved in an eminent domain proceeding"). In its 2007 decision, the panel instructed this court to determine whether that doctrine insulates Joliet from the plaintiffs' claims. New West, 491 F.3d at 722 ("Only if the Noerr-Pennington doctrine is inapplicable must the district court address the merits of New West's contentions."). Whether Joliet is shielded turns on whether its actors' conduct is protected or comes under the "sham" exception to Noerr. See Kearney, 590 F.3d at 644-48. Since 2007, plaintiffs' allegations of discrimination have grown more complex. These factually intricate questions do not lend themselves to disposition on a motion to dismiss. Cf. id. at 647-48 (district court's rationale for Noerr immunity strayed to issues beyond the plaintiff's allegations). Courts routinely reserve resolution of Noerr's application for summary judgment. See, e.g., Tarpley, 188 F.3d at 789 (deciding Noerr issue on summary judgment); Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 404 (7th Cir. 1993) (same); Affordable Hous. Dev. Corp. v. City of Fresno, 433 F.3d 1182, 1190 (9th Cir. 2006) (same); White v. Lee, 227 F.3d 1214, 1220 (9th Cir. 2000) (same). Joliet's motions to dismiss under Noerr are premature.

### b. Statutory Claims: The United States

Joilet contends the government fails to state a claim under HCDA because, the city insists, the statute does not require Joliet to establish new housing for displaced residents. The government, however, is suing under the anti-discrimination section of HCDA, 42 U.S.C. § 5309. Joliet draws its argument from the "statement of activities and review" section of HCDA, id. § 5304. The former requires the government to show racial discrimination, use of program funds, and a determination by the Attorney General of a pattern or practice of HCDA violations. Id. § 5309. In sharp contrast, the latter spells out numerous conditions for receipt of funds such as requirements to submit plans and reports and permit random audits. Id. § 5304. Joliet clings to its assertion that the § 5304 conditions do not require providing alternate housing. But this is not dispositive in an anti-discrimination claim under § 5309 where the government alleges violations that go beyond a failure to provide alternate housing. The government alleges racial discrimination in the city's treatment of Evergreen Terrace going back to 1978, see Gov't Compl. & Demand for Jury Trial 7 ¶ 24, and seeks to enjoin Joliet from condemning the complex without providing adequate alternative housing for displaced tenants. Joliet apparently confuses the conditions for receipt of HCDA funds with the relief the government is seeking. Joliet's argument is meritless and borderline frivolous.

Joliet also argues the government fails to state an FHA claim. The city contends the government fails to allege a pattern or practice of discrimination. The FHA authorizes suit where a defendant "is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by [the FHA], or than any group of persons has been denied any of the rights granted by [the FHA] and such denial raises an issue of

general public importance." 42 U.S.C. § 3614(a). The court has already found the government alleged ripe Article III injury. The government's list of alleged violations does not suggest isolated or sporadic actions by Joliet. This element may also be satisfied by showing adoption of a policy. See United States v. City of Chi. Heights, 161 F. Supp. 2d 819, 842 (N.D. Ill. 2001) (finding that a zoning denial to a non-profit mental health provider violated the FHA). The government's complaint satisfies the pattern-or-practice element of an FHA claim. Joliet's argument is meritless.

### C. Supremacy Clause/Implied Preemption: New West

Joliet argues that New West's Supremacy Clause count should be dismissed because the Seventh Circuit earlier rejected implied preemption arguments advanced by the government in the condemnation action. See New West, 562 F.3d at 832-33. Joliet is correct. New West renews the same kind of implied preemption arguments the government made in the 2009 decision. See Joliet's Second Am. Compl. 24-25. The 2009 panel in a detailed discussion rejected those arguments. See New West, 562 F.3d at 834-37. New West observes, correctly, that it has added new claims alleging Joliet took action in violation of specific anti-discrimination statutes—which are not implied preemption claims. New West is also correct that it may maintain a § 1983 claim on these new allegations. Plaintiffs are entitled to use the Supremacy Clause offensively "to obtain a declaration that a rule of federal law supercedes the rules that the state actors are implementing." New West, 491 F.3d at 719. But New West's new allegations are not found in count four of New West's Second Amended Complaint, which instead contains obsolete implied preemption arguments. Joliet moves the court to dismiss New West's implied preemption claims in count four. The motion is granted.

## CONCLUSION

Joliet's motion to dismiss New West's implied preemption claim in count four of its Second Amended Complaint is granted. The rest of Joliet's motions to dismiss are denied. Joliet's motions to stay are addressed in a separate order.

IT IS SO ORDERED.

ENTER:

_[signature: Charles R. Norgle]_

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: 1-30-12